UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| DEBBIE A. WYNN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 22-099-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Debbie Wynn appeals the denial of her claim for disabled widow's insurance benefits.  Specifically, Wynn contends that the ALJ assigned to her case failed to properly evaluate the medical evidence in determining her severe impairments and ability to work. Upon review of the record and the parties' arguments, however, the Court finds that the ALJ applied the law correctly and based her decision on substantial evidence.  Accordingly, the Defendant Acting Commissioner's decision will be affirmed.

**I.**

Wynn filed the present application for disabled widow's insurance benefits on March 1, 2018, alleging disability beginning on February 12, 2018.  [*See* Administrative Transcript, hereafter, "Tr." 235-41.]  The claim was denied initially (on August 21, 2018) and upon reconsideration (on December 3, 2018).  [Tr. 116, 126]  ALJ Tommye Mangus held an administrative hearing on January 11, 2021, and issued a written opinion denying benefits on April 15, 2021.  [Tr. 46-66; 67-82]  The Appeals Council denied Wynn's request for review

on March 15, 2022.  [Tr. 1-6]  Thus, this matter is ripe for judicial review.  *See* 42 U.S.C. § 405(g).

## II.

Wynn was 53 years old at the time of the ALJ's decision.  She has a seventh-grade education and a limited work history, having been employed previously for short periods of time as a cashier, cook, and salesperson at a shoe store.  [Tr. 73, 267]  Wynn reported that she began experiencing significant depression after her husband passed away in 2014, although medication did help somewhat.  [Tr. 76]

Wynn experienced a profound hearing loss in her right ear beginning in childhood.  [Tr. 74]  She reported that a medical professional told her that hearing aids would not help because the hearing loss was caused by nerve damage.  [Tr. 279]  Alternatively, Wynn reported that she had not gotten hearing aids because she could not afford them.  She stated that she could hear from her left ear "as long as there [was] no background noise."  Wynn also testified as having pain and swelling in her neck, back, arms, hands, and knees due to arthritis.  [Tr. 77]  And she indicated in her function report that she could not walk or stand without severe knee pain.  [Tr. 294]  Wynn experienced some relief by lying down and propping her legs up four to five times per day.  [Tr. 78]

Wynn's self-reported daily activities included reading and watching television, although it was difficult for her to hear.  She is able to prepare simple meals and could perform household chores including laundry and vacuuming.  [Tr. 296]  She reported going to church and the grocery store with her daughter once or twice per week.  [Tr. 298]  Wynn stated that she did not have an active social life and could not follow spoken instructions very well due to her hearing loss.

Wynn received primary care at the Mountain Comprehensive Health Center.  Various providers treated her from October 2016 through February 2021 for a range of conditions, including chronic ear pain, neck pain, and allergies.  She presented to the clinic in April 2017 complaining of left knee pain of two days' duration with no known injury.  [Tr. 360-62]  The clinician ordered x-rays (which were normal) and referred Wynn to physical therapy.  In July 2018, Wynn presented seeking a tetanus shot after she "shot [a] nail" into her thumb.  [Tr. 424] A CT scan of Wynn's cervical spine in December 2020 showed minimal degenerative osteoarthritis at C1-C2, but otherwise was normal.  [Tr. 608]  Wynn participated in physical therapy for neck pain in early 2021.  [Tr. 613]  An MRI of her paranasal sinuses was unremarkable in September 2020 and a DEXA scan in February 2021 revealed an early degree of osteoporosis.  [Tr. 669]

Wynn began treatment for right knee pain at Kentucky Orthopedic Clinic in October 2018.  [Tr. 447]  She reported that the pain started about two years prior but did not recall any injury.  Although the pain increased in severity with movement and weightbearing, Wynn's gait was non-antalgic.  She exhibited a full range of motion and had no pain or instability upon valgus and varus stress testing.  Other manual tests for dysfunction were negative, but Wynn did complaint of mild medial joint line tenderness.  [Tr. 448]  An x-ray revealed mild medial joint space narrowing.  Adam Adkins, PA-C administered an intra-articular injection of dexamethasone and recommended physical therapy.

Wynn followed up with Adkins in December of 2018, but had not participated in a significant amount of physical therapy at that point.  [Tr. 458-61]  Wynn subsequently attended physical therapy approximately five times in December 2018 and January 2019, with treatment consisting of therapeutic exercise, manual therapy, modalities, and patient education.  [Tr. 463-

81]  She then returned to Kentucky Orthopedic Clinic complaining of continuing right knee pain in March 2019.  [Tr. 534]  An x-ray of her knee showed no abnormal findings.  [Tr. 389]

Wynn returned to Kentucky Orthopedic Clinic in October 2019 after she injured her left ankle toward the end of September.  She reported that she was "working on a porch when a cinderblock caused a jack to strike the lateral aspect of her ankle."  [Tr. 531]  Wynn went to the emergency department where she was diagnosed with a lateral malleolus avulsion fracture.  Adkins prescribed an Equalizer boot and anti-inflammatory medication.  [Tr. 532]

Wynn also received some mental health treatment during the relevant time period.  She initiated treatment at Cumberland River Behavioral Health ("CRBH") in December 2018 at the suggestion of her adult children.  [*See* Tr. 499-516]  At CRBH, Wynn had regular counseling sessions with Janet Nantz, LPCC, and medical appointments with Syed Raza, M.D.  While Wynn's primary care provider prescribed Effexor for mood stabilization, Raza prescribed Remeron, which helped with Wynn's sleep disturbances.  [Tr. 499-07, 548]

Raza reported in March 2019 that Wynn was doing better and sleeping well.  He also indicated that her thoughts were organized, she was able to socialize well, and she did not want any changes to her medication.  [Tr. 488]  However, in January 2020, Raza increased the dosage of Remeron at Wynn's request because she was still having problems sleeping.  [Tr. 546]  In December 2020, Wynn advised Dr. Raza that she had not been taking her medications for the last few months and had worsening symptoms.  [Tr. 621]

Nantz described Wynn as neat, cooperative, alert, attentive, reliable, and honest, with appropriate affect and dress.  She found that Wynn's sustained mood was depressed.  Nantz reported that Wynn understood the consequences of her behavior and the nature of her problems; her recent and remote memory was intact; her estimated intelligence was in the

average range; her speech and thought was clear and coherent; and there was no evidence of perceptual disturbance. [Tr. 487] Nantz authored a letter in May 2020, stating that there had been barriers to Wynn's progress including her complicated grief and her symptoms of depression. Nantz observed that Wynn had worked hard to keep her regular appointments and to meet treatment goals, but had struggled at times due to the severity of her symptoms, having limited support, and other family stressors. [Tr. 605]

A. Dahhan, M.D., examined Wynn on April 3, 2018, for the purpose of providing an opinion regarding her application for social security benefits. [Tr. 388] Dahhan remarked that while Wynn's hearing was impaired, she "presently tries to read lips and does a good job about it." He stated that she could hear normally when she was standing in front of the speaker, but when he went behind her, she had difficulty hearing a whisper from a distance of five feet. The problem was corrected when he stood in front of her.

Dahhan noted that Wynn had a history of elevated lipids and was taking Crestor. She had frequent pain and swelling in the knees that was "more so on the right side." However, she was ambulating on her own without any assistive devices. [Tr. 389] While the range of motion in her right knee showed impairment, an x-ray showed no abnormal findings.

Wynn participated in an audiology evaluation for purposes of her disability determination on July 30, 2018. [Tr. 405] Audiologist Mike Lukat concluded that Wynn "was not cooperative." He remarked that she had "good understandable speech," and that the "test results were suspect" because "bone conduction was worse than air conduction, positive stenger at .5k, 1k, 2k, and 4k, [and] SRT in the left ear was worse than PTA." [Tr. 407]

Randall Dalton, M.D., of Lake Cumberland Medical Associates, examined Wynn the same day. [Tr. 410] He noted that the adequacy of the hearing evaluation results was uncertain

but that Wynn had severe hearing loss in her right ear and mild to severe hearing loss in her left ear.  He recommended that objective audiological testing be carried out using otoacoustic emissions testing and/or auditory brainstem response testing.  [Tr. 411]   An audiogram performed in February 2020 revealed 96 percent and 100 percent live voice recognition in the right and left ears, respectively.  [Tr. 56, 591-94]

William Rigby, PhD performed a mental status consultative examination on behalf of the Department for Disability Determination on November 6, 2018.   [Tr. 451]   After interviewing and examining Wynn, Rigby determined that Wynn had no impairment to understand, retain, and follow simple instructions or to sustain concentration and persistence to complete tasks in a normal time.  However, Dr. Rigby concluded that she had moderate impairment to maintain social interaction with supervisors, friends, and the public and to adapt and respond to the pressures of normal day-to-day work activity.  [Tr. 456]

Wynn's attorney referred her to Reba Moore, a "licensed psychological practitioner," for a psychological evaluation on May 30, 2019.  [Tr. 520]  Moore administered the Wechsler Adult Intelligence Scale-Fourth Edition and determined that Wynn's general cognitive ability was within the borderline range of intellectual functioning.  [Tr. 522]  She also found that Wynn's verbal and nonverbal reasoning abilities, as well as her abilities to sustain attention, concentrate, exert mental control, and to process simple or routine visual material without making errors were in the borderline range.  [Tr. 523]  Wynn scored "extremely low" on the Wide Range Achievement Test Fifth Edition for math computation and word reading.

Moore completed a mental medical source statement on June 10, 2019, indicating that Wynn would have a moderately limited ability to understand and remember simple instructions and a marked limitation with respect to carrying out simple instructions.  [Tr. 527] Moore also

indicated that Wynn would have marked limitations in her ability to interact appropriately with supervisors or co-workers and would have extreme limitations in her ability to interact appropriately with the public. [Tr. 528]

Consulting source Ammie Maravelli, M.D., provided a physical residual functional capacity ("RFC") assessment after reviewing Wynn's file on July 31, 2018. [Tr. 93-95] Maravelli determined that Wynn did not have any exertional, postural, manipulative, or visual limitations. However, she believed that Wynn should avoid even moderate exposure to noise due to her right-sided hearing loss. [Tr. 94] Esther Pinder, M.D., reviewed the file and assessed these same limitations on November 15, 2018. [Tr. 108-10]

Agency consultant Alex Guerrero, M.D., provided a mental RFC assessment on December 3, 2018. [Tr. 110-12] He opined that while Wynn's ability to understand and remember detailed instructions was moderately limited, her ability to do so with respect to very short and simple instructions was not significantly limited. He also found that her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances was not significantly limited. Guerrero believed that Wynn could work in coordination with others, make simple work-related decisions, and complete a normal workday and workweek without significant limitations. [Tr. 111]

Guerrero also concluded that Wynn could carry out simple chores with adequate attention and concentration for two-hour segments in an eight-hour workday. He believed she could relate adequately with coworkers and supervisors with limited interaction in most work settings with only occasional exposure to the general public. Finally, Guerrero concluded that she could adapt to changes in non-complex work settings with no more than mild to moderate stress levels and work that is not fast-paced or quota driven.

ALJ Mangus determined that Wynn had the severe impairments of hearing loss, anxiety, and depression.  [Tr. 51]  But after considering the entire record, she determined that Wynn had the RFC to perform a full range of work at all exertional levels that did not require exposure without hearing protection to noise above level three as defined in the Selected Characteristics of Occupations ("SCO").  Mangus further concluded that Wynn could

> understand, remember, and carry out simple instructions and tasks requiring brief initial learning periods of 30 days or less, little independent judgment, and minimal variation; maintain attention and concentration for extended, 2-hour periods throughout an 8-hour workday with typical 15-minute morning and afternoon breaks and a 30-minute lunch break; relate adequately with coworkers and supervisors for task completion in a work setting that requires only occasional interaction with the general public; and adapt to occasional workplace changes in a routine job setting that does not involve fast-paced or quota-driven work.

[Tr. 55]

While Wynn had no past relevant work, a qualified vocational expert testified that there were jobs existing in significant numbers in the national economy that someone with this RFC could perform.  [Tr. 59-60]  Accordingly, the ALJ determined that Wynn was not under a disability and not entitled to widow's benefits under the Social Security Act ("Act").

**III.**

To qualify for disabled widow's insurance benefits, the widow must: not be married; be between 50 and 60 years old; be the spouse of a wage earner who died fully insured;  file an application for social security benefits; and be "under a disability" as defined in the Social Security Act.  42 U.S.C. § 402(e).  The only issue in dispute here is whether Wynn was "under a disability" as defined by 42 U.S.C. § 423.

A "disability" under the Act is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one

year's expected duration." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)). A claimant's Social Security disability determination is made by an ALJ in accordance with "a five-step 'sequential evaluation process.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc). If the claimant satisfies the first four steps of the process, the burden shifts to the Commissioner with respect to the fifth step. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

A claimant must first demonstrate that she is not engaged in substantial gainful employment at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(c). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months and which meets or equals a listed impairment, she will be considered disabled without regard to age, education, and work experience. 20 C.F.R. § 404.1520(d). Fourth, if the claimant has a severe impairment but the Commissioner cannot make a determination regarding disability based on medical evaluations and current work activity, the Commissioner will review the claimant's RFC and relevant past work to determine whether she can perform her past work. 20 C.F.R. § 404.1520(e). If she can, she is not disabled. 20 C.F.R. § 404.1520(f).

Under the fifth step of the analysis, if the claimant's impairments prevent her from doing past work, the Commissioner will consider her RFC, age, education, and past work experience to determine whether she can perform other work. If she cannot perform other work, the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1520(g). "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work

available in the economy that the claimant can perform.'"  *White v. Comm'r of Soc. Sec.*, 312

F. App'x 779, 785 (6th Cir. 2009) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th

Cir. 1999)).

It is noteworthy that this Court's review is limited to determining whether the ALJ's

findings are supported by substantial evidence and whether the ALJ applied the proper legal

standards in reaching her decision.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007).  Substantial evidence is such relevant evidence as reasonable minds might accept as

sufficient to support the conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass

v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).  The Commissioner's findings are conclusive

if they are supported by substantial evidence.  42 U.S.C. § 405(g).

## IV.

### A.    The ALJ properly assessed the medical evidence.

ALJs are no longer required to defer or give particular evidentiary weight to treating

physician opinions.  *See* 20 C.F.R. § 404.1520c(a).  Instead, an ALJ will consider the following

factors when reviewing all medical opinions: supportability; consistency; relationship with the

claimant; length of the treatment relationship; frequency of examinations; purpose of the

treatment relationship; extent of the treatment relationship; examining relationship;

specialization; and other factors including the source's familiarity with other evidence

regarding the claim or an understanding of the disability program's policies and requirements.

§ 404.1520c(c)(1)-(5).  The ALJ will articulate her determination regarding the persuasiveness

of the source based on these factors.  § 404.1520c(b).

Wynn argues that the ALJ in her case "minimized the medical records that establish

that she suffers from severe hearing impairment in both ears."   However, the ALJ

acknowledged that medical testing affirmed Wynn's claim of decreased hearing bilaterally, more so in the right ear. [Tr. 56] She fairly summarized the remaining evidence concerning Wynn's hearing, including the results of the 2020 audiogram and Dr. Dahhan's report that Wynn could hear and understand normal speech "just fine" as long as she could see the listener. Wynn also argues that the ALJ "acted as her own medical expert" with respect to hearing loss, presumably because she noted that Wynn had no problem hearing the telephone proceedings with the use of a mechanical amplifier. However, an ALJ may take into account her own observations of the claimant as part of her overall evaluation. *See e.g., Blankenship v. Comm'r of Soc. Sec.*, 2015 WL 5040223, at \*10 (6th Cir. Aug. 26, 2015).

Wynn also suggests that the ALJ unduly minimized Reba Moore's comment that she had a "speech problem." But Wynn does not point to any other evidence indicating that she had speech limitations or otherwise indicate how this comment should have factored into the ALJ's analysis. The ALJ did not err in simply pointing out that this vague assertion by Moore, a licensed psychological practitioner, was contradictory to the audiologist's conclusion that Wynn had "good, understandable speech."

Wynn argues that the ALJ "completely disregarded [her] treatment for her right and left knee as well as her neck in regard to these severe impairments" and that she "would clearly not be able to work at all exertional levels." To the extent Wynn alleges that the ALJ erred in failing to deem her knee and neck pain severe impairments, such a failure does not constitute reversible error as long as the ALJ found that the claimant had other severe impairments and moved on to the other steps of the analysis. *Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 597 (6th Cir. 2018). This is because an ALJ must consider the limitations imposed by *all* of an individual's impairments if the individual has any impairment that is severe. *Id.*

- 11 -

Further, the ALJ discussed these allegations and explained the reasons she found them unsupported by the medical evidence. [Tr. 52]  With respect to Wynn's claims of knee pain, physical and diagnostic exams were unremarkable.  While Wynn last visited the Kentucky Orthopedic Clinic in December 2018, there was no documented follow-up after that time and no evidence that Wynn sought treatment with a specialist for the treatment of knee pain.  With respect to neck pain, Wynn complained of "moderate" symptoms beginning in September 2020 and exhibited little in the way of clinical manifestation.  Further, the CT scan of Wynn's neck in December 2020 was largely normal.  [*See* Tr. 608.]  The ALJ also noted that Wynn's own reports of performing household renovations were inconsistent with her claims of disabling neck and knee pain.

Finally, Wynn argues that the ALJ should have given "greater or different weight and should not have discounted" the opinions of Reba Moore and Janet Nantz.  While she does not say so explicitly, Wynn suggests that the ALJ did not sufficiently explain her reasons regarding the persuasiveness of these opinions.

The supportability and consistency of a medical opinion are the most important factors an ALJ must consider.  20 C.F.R. § 404.1520c.  Here, the ALJ explained that Moore's assessment of "extreme" limitations for public interaction, in addition to "marked" limitations for simple instructions, socialization, and adaption, was not consistent with or supported by the mental healthcare records from CRBH. [Tr. 58]  While Wynn had some ongoing issues with sleep and grief, which were worse around dates like holidays and birthdays, she had stabilized with medication and had not required adjustments.  Likewise, the ALJ concluded that Nantz's characterization of Wynn's symptoms as totally disabling was inconsistent with

the remainder of the record, including Wynn's own reports of independence and working on projects at home.

### B.      Substantial evidence supports the ALJ's decision.

An ALJ's findings are conclusive as long as they are supported by substantial evidence. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 851 (6th Cir. 1986). Substantial evidence means more than a mere scintilla—it is such relevant evidence as a reasonable mind might accept. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). The Court defers to the agency's decision "even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

Substantial evidence supports the ALJ's decision. With respect to Wynn's physical capacity to work, the ALJ reasonably relied, in part, on the results of the examination Dahhan performed on April 3, 2018. While Dahhan noted that Wynn had some hearing difficulties, he observed that she ambulated on her own and did not need an assistive device. [Tr. 389] She had no muscular atrophy or paralysis and her reflexes were intact and symmetrical. Wynn did not have any sensory impairment and, while her right knee range of motion was impaired, there were no other abnormalities.

Wynn received minimal treatment for her physical impairments. And with the exception of audiological testing, diagnostic tests indicated mild results at worst. Consulting sources Maravelli and Pinder indicated that Wynn's only physical restrictions would involve exposure to noise.

The undersigned concludes that the ALJ's findings with respect to Wynn's mental RFC also are supported by substantial evidence. The ALJ noted that, while Wynn experienced

longstanding grief and depression, she managed these conditions with medication and outpatient therapy.  Upon examination, Dr. Rigby assessed moderate limitations for workplace socialization and adaptation, but otherwise no restrictions, which the ALJ found consistent with Wynn's relatively high GAF score and successful mental health treatment.  [Tr. 58]  The ALJ's mental RFC also was consistent with conclusions of consultant Guerrero, who concluded, *inter alia*, that Wynn could understand and carry out simple instructions and interact occasionally with the general public.

## V.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.     Plaintiff Debbie Wynn's motion for summary judgment [Record No. 7] is **DENIED**.

2.     Acting Commissioner of Social Security Kilolo Kijakazi's motion for summary judgment [Record No. 9] is **GRANTED**.

Dated: September 26, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky